## Hood v. Smith *et al.*

**Contracts:** EXCHANGE OF LANDS: MUTUAL MISTAKE: RESCISSION IN EQUITY: ACTION BASED ON FRAUD. Where plaintiff conveyed his farm to defendant for land which neither of them had seen, being situate in a distant state, but which defendant said he believed, from what he had heard of it, would make a good stock farm, but which the evidence (see opinion) shows was not fit for that purpose, and was of little value for any purpose, *held* that there was a mutual mistake,—on the part of defendant as to the kind of land he was conveying, and on the part of plaintiff as to the kind of land he was getting,—and that equity would compel a restoration, even though the action was based upon alleged fraudulent repre- sentations upon the part of defendant, which were not proved. (Compare *Sweezey v. Collins*, 36 Iowa, 589, and other cases cited in opinion.)

| | |
|---|---|
| 79 | 621 |
| 86 | 288 |
| 79 | 621 |
| 99 | 555 |
| 79 | 621 |
| 113 | 813 |
| 113 | 639 |
| 79 | 621 |
| 123 | 589 |
| 79 | 621 |
| 132 | 344 |
| 79 | 621 |
| f138 | 592 |

Hood v. Smith.

*Appeal from Union District Court.*—Hon. R. C. Henry, Judge.

Filed, February 12, 1890.

Action in equity to set aside a contract for the sale of lands. Decree for plaintiff, and defendants appeal.

*Maxwell & Leonard* and *Jas. G. Bull,* for appellants.

*McDill & Sullivan,* for appellee.

Granger, J.—I. Plaintiff and defendant, Estella C. Hood and Celesta A. Smith, are, respectively, the wives of J. C. Hood and H. M. Smith, and as, in the transaction which is the subject-matter of this action, the husbands were the agents and negotiators, in our consideration of the case we will refer to them as the parties, for convenience.

In February, 1887, the plaintiff owned one hundred and twenty acres of land in Union county, Iowa, on which there was a mortgage of two thousand dollars. The defendant Smith, at the same time, owned a half section of land in Custer county, Nebraska. Hood and Smith met at Creston, Iowa, and negotiated an exchange of lands; Hood being allowed by the terms of the trade to retain the use of the Union county land for the year 1887, and he to pay the taxes for that year. The consideration paid by Smith for the Union county land was the Nebraska land, the two-thousand-dollar incumbrance on the Union county land, and the use of the land for the year 1887. The estimates placed upon the lands by their owners in their negotiations were thirty-five dollars per acre for the Union county land, and eight dollars per acre for the Nebraska land. Neither Smith nor Hood had ever seen the Nebraska land, and it is claimed in this action that Hood purchased it relying on Smith's representations that it was good farming land, and would make a good stock farm; and we are

asked to rescind the contract of sale on the ground that such representations were false. With regard to the true character of the Nebraska land, our examination of the evidence satisfies us that it was not good farm land, or suitable for a good stock farm. The testimony as to its character is not entirely harmonious, yet it is so strong in favor of our conclusion as to leave little room for doubt as to its correctness.

The most reliable evidence of the character of the land, we think, is from residents of Nebraska, who reside in its neighborhood. Some seven such witnesses have been examined,—four for plaintiff, and three for defendant. All the witnesses agree that the land is badly cut by canons or gullies. They do not entirely agree as to the extent of such canons. One Peet, examined for plaintiff, says of the land that it is too rough for stock-raising, or raising corn, oats or wheat; that several ravines run through it eighty feet deep, and from two hundred to six hundred feet wide; that they damage the land seventy-five per cent. for farming purposes; that good farming land (uncultivated) is worth from ten to twelve dollars per acre; that the land in question is worth $2.50 per acre; that one quarter section contains five acres of plow land, and the other fifteen acres. The other three witnesses, examined for plaintiff, fix the amount of plow land at from fifteen acres to twenty-five on the half section. They fix the value of the land at from two dollars to $2.50 per acre. Three of them say, in terms, that the land is not suitable for a stock farm; and, while the other says "the place is fair for stock-raising," he also says "it is not fit for raising corn, wheat or oats;" "not good farming land;" "not good hay land." This witness lives half a mile west of the land, and fixes its value at $2.50 per acre. These witnesses, all in a general way, corroborate the witness Peet as to the canons and general topography of the land. A Mr. Johnson, examined for defendant, describes the land as rough, except two pieces,—one of five acres, and one of twenty acres. He says the canons are deep cuts, and there are three

of them on the land; that any of the land would produce grass, and that, aside from about twenty acres, the land is rolling and rough; that it would not be a good farm for raising grain, but all right to pasture stock. One Hummell, for defendant, says one hundred acres of the land could be plowed, and would do for raising grain, and the balance would make good pasture. A Mr. Norsoorth, also for the defendant, speaks of the land as mostly rolling, with two pieces of table-land, and says it is good hay land, with rich soil. He says it is worth $15.50 per acre and was in 1887 worth six dollars per acre.

This is a summary of but a part cf the testimony on this branch of the case. Other witnesses, including the defendant H. M. Smith, gave testimony in this respect; but, when all considered, it must be conceded that the land was not suitable for a good stock farm. We think the difference in the conclusion of the witnesses as to the adaptability of the land, both for culture and stock-raising, arises from the fact that each has in view different standards of utility. Perhaps, in better terms, it may be said that some are testifying as to the practical adaptation of the land, and others as to purposes for which it could be used. For instance, some speak of "good plow land," or use an equivalent term, and others of land that "could be plowed." None of the Nebraska witnesses say, in terms, that the land is suitable for a good stock farm, or for general culture, although it is perhaps fair to infer that two of them mean that. Their conclusions are somewhat doubtful. Our conclusion, from all the testimony, is that the land is not adapted for use, when improved, as a good farm, either for stock-raising or general culture.

II. It is next a question if the transaction involves facts which entitle the plaintiff to a rescission of the contract. It is pressed in argument by plaintiff that the transaction involves a fraud on the part of Smith which entitles her to a rescission, and very much testimony is directed to that question; but, with our view of the case,

it is unnecessary to decide any question as to a fraudulent purpose. We thind there is a practically conceded state of facts, barring that of the true character of the land, upon which the case may be decided, and such a course is certainly to be preferred to reconciling disputed questions of fact.

The evidence all tends to show, and it is nowhere questioned, that Hood designed to and supposed he was getting land suitable for a good stock farm. The contention by appellant is that, if he did not get it, it was his own fault, and not the result of misrepresentations by him. Taking this much, then, for granted as to the purpose of Hood, we next look to the conduct or purpose of Smith, to see if it is such as, when taken with that of Hood, should avoid the sale. A brief extract from the testimony of H. M. Smith will be sufficient for our purpose, and it is as follows: "We made the trade, and entered into a contract. There was a sectional map of Nebraska on the wall during all these interviews, giving the distance from one place to another. It showed the Union Pacific railroad and the town of Gothamburg. It showed townships and sections. We traced the distance from Gothamburg by county sections. I had never seen the land. Never had been in Custer county. He asked me about the land. I told him I could not describe it; that I had never seen it, any more than I had heard that it was fair land, and I believed it would make a good stock farm." Nothing in all the record in any manner contradicts this. Smith's information then was, which he had no reason to disbelieve, that it was fair land, and would make a good stock farm. Then we must assume that Smith supposed he was selling to Hood land for a good stock farm, and Hood supposed he was getting such. What, then, is a legitimate conclusion? A mutual mistake. Hood did not get such land as he supposed he was buying. Smith did not convey such land as he supposed he was selling. Both were mistaken. Natural justice, in such a case, demands that the parties themselves should

restore the property taken, and, if one refuses, equity will compel a restoration.

III. It remains to be seen if the relief can be granted in such case, where it is asked on the ground of fraud. That it may be is clearly ruled in *Sweezey v. Collins*, 36 Iowa, 589, and the ruling has strong support in *Wilcox v. University*, 32 Iowa, 367; *Seeberger v. Hobert*, 55 Iowa, 756; and *Mohler v. Carder*, 73 Iowa, 582. The judgment of the district court is right, and is

