E. M. Watson v. A. C. Brown and Walter Crowell, Appellants.

**Sales:** RELIANCE ON REPRESENTATIONS OF VENDOR: *Examination by vendor.* Where one of the defendants, unfamiliar with machinery, examined a machine made by plaintiff for weaving wire fence, and it was agreed that a corporation should be formed for its manufacture, plaintiff to give his time and use of his machine, and receive wages and shares ~~ stock, in an action by him for such compensation, after the closing of the factory, the defense that the machine would not make saleable cloth, as represented by plaintiff, was not met by the fact of the examination of the machine by the defendant, he having a right to rely on plaintiff's representations.

PRESUMPTIONS AS TO RELIANCE. It will be presumed that defendant relied upon plaintiff's representations.

WHEN OFFER CONSTITUTES REPRESENTATION. The defense that the machine would not make saleable cloth, as represented by plaintiff, could not be met by the contention that he made no representations, since his offer was equivalent to the same.

RESCISION. Where the machine did not make a marketable article, defendants were not liable to plaintiff for value of the stock promised or for wages after the time when they notified him that the agreement was a nullity, since there was, at least, a mutual mistake, for which a right of rescision is given.

SAME. Plaintiff should have been allowed wages up to the time when he was notified that the contract was rescinded, he not having been told that the enterprise was at an end when the factory closed.

*Offer to return.* Where the manufacturers informed the maker of the machine that the contract was a nullity, and a few weeks thereafter plaintiff sued for compensation and the stock, and defendants in their answer offered to return what they had received, the offer to return was sufficiently prompt to enable them to rescind the contract.

*Appeal from Palo Alto District Court.*—HON. W. B. QUAR-
TON, Judge.

THURSDAY, FEBRUARY 7, 1901.

ACTION, founded on contract, to recover the value of certain shares of stock and wages earned. The defendants put in issue plaintiff's right to recover, and ask that the contract be annulled, and that an accounting be had between them and plaintiff in the matter out of which the latter's cause of action arose, and also pray judgment on certain items of charge against plaintiff. On defendant's motion, the cause was transferred to the equity side of the calendar. From a decree in plaintiff's favor, defendants appeal.—*Modified.*

*E. A. Morling* for appellants.

*Carr & Parker* and *B. E. Kelley* for appellee.

WATERMAN, J.—Prior to February 28, 1898, plaintiff was a resident of Lanark, Ill. He was a machinist and inventor, and owned a machine, of his own design and construction, for the manufacture of woven-wire fence. The defendants were residents of West Bend, in this state. Brown was a banker, and Crowell was engaged in the sale of hardware and agricultural implements. Defendants were desirious of establishing in West Bend a factory for the manufacture of woven-wire fence. They learned that plaintiff had given the matter of making such fence attention, and had a machine for weaving it. After some preliminary correspondence, and after defendants had seen a small sample of the work done by the machine, Brown went to Lanark to make further investigation. Plaintiff and son were present at this interview. The machine was seen by Brown, and a few feet of fence were woven in his presence. After some conversation, to which we shall refer more

specifically later on, the following contract was entered into: "E. M. Watson, Lanark, Ill., Carroll Co., first party, and A. C. Brown and Walter Crowell, of West Bend, Palo Alto Co., Iowa, second party. The first party, for and in consideration of the covenants hereinafter mentioned, agrees with party of the second part to engage with them in the manufacture of woven-wire fence in the town of West Bend, Iowa, on the following terms and conditions, as follows: The said party of the first part agrees to furnish one fence machine of his own invention, and now owned and controlled by him, together with all machines of the same nature now in existence or under construction owned or controlled by said first party, together with all future improvements. First party further agrees to superintend the manufacture of woven-wire fence, and construction of new machines, and all improvements in the factory at West Bend, Iowa, 'and, under direction of second party, to convey, [by] bill of sale, machines now in his possession. For and in consideration of the above covenant to be kept and performed by first party, the second party agrees to pay to first party $50 per month for the first six months for services rendered, and at the expiration of said time his wages shall be adjusted according to prospects and circumstances, and to further issue to said first party $2,250 in capital stock of his company when same shall be incorporated, and to receive $250 in cash. The capital stock shall be $10,000 when incorporated. Witness our hands this 28th day of February, 1898. [Signed] E. M. Watson, A. C. Brown."

Plaintiff shipped his machinery to West Bend, where it was installed in a building erected by defendants, and in April, 1898, he began the manufacture of fence, defendants furnishing materials. In January, 1899, the factory was closed by order of defendants, and it is now claimed the contract was annulled for total failure of consideration, in that the machine furnished by plaintiff would not weave a saleable fence.

No inconsiderable part of the testimony is devoted to an attempt to show what representations in relation to the machinery were made by plaintiff to Brown at the time the contract was executed. Brown claims plaintiff represented that the machine was patented, and would produce from 300 to 500 rods of perfect fence per day. Plaintiff denies having said that he had a patent on the machine, or that it was of the capacity mentioned, or would produce perfect fence. He shows a disposition to quibble on the word "perfect," saying that no product of human hands or brain is perfect. Whatever the exact language used may have been, it is clear that plaintiff represented the machine as capable of weaving a fence that would be saleable in competition with other woven-wire fences on the market, so far, at least, as its construction was concerned. Indeed, if plaintiff had made no verbal statement, the legal situation would not be different. He knew that defendants were looking for a machine to weave fence that was to be sold in open market. When he offered his machine for the purpose, it was equivalent to a representation that it would do the work required. But it is said Brown investigated for himself. True, he went to see plaintiff and his machine, but it can hardly be said that he did more than inquire about the machine. He had no special knowledge of machinery. This machine was of plaintiff's own invention. Plaintiff manifestly knew more of it than any other person could learn by inspection. Brown was certainly warranted in relying on what plaintiff said about it, and the law will presume, under the circumstances, that he did so rely. *Hicks v. Stevens,* 121 Ill. Sup. 186 (11 N. E. Rep. 241).

We now reach a much-mooted question, viz: was the machine capable of producing a saleable fence? We think the overwhelming weight of the testimony is to the effect that it was not. The design or pattern of fence consisted of several horizontal cables, made of two wires twisted together, and at frequent intervals upright pickets, each of a single wire,

were firmly woven into the cable twist. If the cables were not held equally tense in the weaving, some would be longer and looser than others in the finished product, and the fence would not stretch tight and even on the posts, so as to leave the pickets upright. The fence, as some witnesses say, will, under such circumstances, "buckle," or, as we understand it, hang loose and awry in places; making it look unsightly, and causing it to be less effective, and to some extent less durable, than if evenly and firmly stretched. It is not disputed but that the defect mentioned was in all the finished product of the machine for a time after it was put in operation. Plaintiff admits its work was not satisfactory for awhile. To remedy this defect he asked of defendants and obtained certain clamps to control the tension of the cable wires as they were fed to the machine. These, when tried, were not a success, and he procured others. He claims the machine did satisfactory work after the last clamps were put on. It would hardly be profitable to go through the 300 pages of testimony which is abstracted, and most of which is upon this point, and set out the evidence upon which we rely. Suffice it to say that we have all read the testimony, and unite in the conclusion that the fence produced by this machine was not a saleable article on the market. If the machine did not produce a marketable article, then the conclusion of law follows that the consideration for the contract between these parties has wholly failed, and defendants are not liable to plaintiff under it for the value of the stock promised, nor for wages, after the time when they notified him that the agreement was annulled. "A mutual mistake as to the nature or fundamental qualities of the subject-matter, so that it goes to the whole substance of the agreement, and renders the subject-matter contracted for essentially different in kind from the thing as it actually exists, may void the contract, but not if the mistake is not mutual." Clark, Contracts, 298. So, in Pollock, Contracts. 421, it is said: "But sometimes, even when the thing which

is the subject-matter of an agreement is specifically ascer-
tained, the agreement may be voided by material error as to
some attribute of the thing; for some attribute which the
thin in fact has not may be a material part of the description
by which the thing was contracted for." *Irwin v. Wilson,*
45 Ohio St. 426 (15 N. E. Rep. 209). Where one agreed
to put in a well and a windmill-pump that would supply de-
fendant's stock with water, plaintiff knowing the number of
head of stock, it was held that defendant could rescind on a
failure of water supply, even though the season was unusu-
ally dry. *Wernli v. Collins,* 87 Iowa, 548. See, also, *Fritzler
v. Robinson,* 70 Iowa, 500; *Hood v. Smith,* 79 Iowa, 625. It
is apparent, from the terms of the written contract which we
have set out, that defendants sought to obtain a machine
that would produce a good fence, in the ordinary accept-
ance of the word—a perfect fence. And it is equally clear
that plaintiff undertook to furnish such. He failed to do so.
If nothing more can be said of the transaction, it was a mut-
ual mistake, for which a right of rescission is given.

We have not overlooked some matters of testimony on
defendants' part that are made the subject of severe criti-
cism. Brown says, although the contract recites that a com-
pany was to be capitalized for $10,000 to manufacture the
fence, he had not in fact decided at the time what he would
do about forming such company, and both he and Crowell
at one time gave as a reason for closing the factory that wire
had gone up in price. But, if the defense here is made out,
neither of these matters affects defendants' rights. So far
as these facts tend to impeach the credibility of the two de-
fendants, they are offset by many matters which tend collat-
erally to impeach plaintiff. For instance, the latter testifies
that the value of the machinery and rights which he trans-
ferred to defendants by the bill of sale was from $25,000
to $50,000, but, when they offer to return all they received,

he refuses to take it, insisting that the contract shall stand, so that he may recover under it less than $3,000.

II.   It is said that defendants have no right to rescind, because at the time the shop was closed they did not at once offer to return what they had received. This action was begun only a few weeks after the shop was closed. In their answer defendants make an offer of return. This was sufficient. *Clapp v. Greenlee,* 100 Iowa, :865; *Gould v. Bank,* 86 N. Y. 83.

III.   The trial court, in making up its finding in plaintiff's favor, allowed him $125 in wages and $2,250 as the value of his stock, making a total of $2,375. It allowed defendants, on certain items of their counterclaim, the sum of $77.66, leaving a net balance due plaintiff of $2,-297.34. We think plaintiff should be allowed wages up to the time when he was notified that the contract was rescinded, included in the amount fixed by the trial court; for when the shop was closed he was not told that the whole enterprise was at an end, and he went on making plans at his house for a new machine, which had previously been talked of between him and defendants. Deducting, then, from the amount allowed by the trial court, the value of the stock, $2,250, and we have left the sum of $47.34, for which plaintiff should have judgment. Plaintiff will pay three-fourths of the costs of this appeal, and defendants one-fourth.—MODIFIED and AFFIRMED.